[No. H031348. Sixth Dist. Apr. 23, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID LITMON, JR., Defendant and Appellant.

COUNSEL

Alfons G. Wagner, under appointment by the Court of Appeal, for Defendant and Appellant.

Dolores A. Carr, District Attorney, and James S. Cahan, Deputy District Attorney, for Plaintiff and Respondent.

OPINION

**ELIA, J.**—On March 15, 2007, without trial, the superior court issued a retroactive order of commitment against David Litmon, Jr., under the new provisions of the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.).[1] The order committed him to an indeterminate term of commitment as a sexually violent predator (SVP) commencing on May 2,

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

2000, the date of his original commitment. The previous order of recommitment, which was issued on September 7, 2005, extended his commitment until May 2, 2004 (a date preceding the order of recommitment).[2] As a result of the retroactive commitment order, the trial on the pending consolidated petitions to extend appellant's SVP commitment for two successive two-year terms (May 2, 2004, to May 2, 2006, and May 2, 2006, to May 2, 2008), which was scheduled for March 19, 2007, did not go forward.

Appellant now argues that the superior court violated his right to due process under the Fourteenth Amendment to the United States Constitution by denying both his motions to dismiss the consolidated petitions on grounds of excessive delay. He also challenges the retroactive commitment order on a variety of grounds, including constitutional and statutory grounds.

We reverse.

A. *Procedural History*

A petition filed April 24, 2002, sought to extend appellant's involuntary commitment as an SVP for a two-year term, running from May 2, 2002, until May 2, 2004. It alleged that appellant had been committed as an SVP on May 2, 2000, and that commitment would expire on May 2, 2002. On November 7, 2003, after a probable cause hearing, the court determined under the first recommitment petition that there was probable cause to believe that appellant was likely to engage in sexually violent predatory criminal behavior upon his release. (§ 6602.)

On February 23, 2004, a second petition to extend appellant's commitment as an SVP for a two-year term was filed. It stated that appellant's current commitment would expire on May 2, 2004, and sought an order extending appellant's involuntary commitment from "May 2, 2002 to May 2, 2004 [*sic*]." On May 5, 2005, after a probable cause hearing, the court determined under this second recommitment petition that there was probable cause to believe that appellant was likely to engage in sexually violent predatory criminal behavior upon his release. (§ 6602.)

On September 7, 2005, following trial on the first recommitment petition, a jury found appellant to be an SVP. The court ordered appellant recommitted as an SVP for a two-year term, running from May 2, 2002, to May 2, 2004. Appellant, who had been representing himself, asked for counsel to be appointed to represent him. The People objected and informed the court that

---

[2] This court granted appellant's request that we take judicial notice of the court records in *Litmon v. Superior Court* (Aug. 26, 2002, H021538) (nonpub. opn.), and *People v. Litmon* (Apr. 26, 2007, H029335) (nonpub. opn.). (Evid. Code, § 452, subd. (d).)

they were ready to immediately proceed to trial on the second recommitment petition. Appellant indicated that he did not have a problem with waiting for trial until February or March. The court stated: "Okay. As long as you understand that, because I don't want there to be an issue . . . . I don't want you taking a writ to the Sixth District saying you didn't get your trial in a timely fashion . . . ." On September 23, 2005, trial on the second recommitment petition was set for February 21, 2006.

On September 29, 2005, a third petition was filed to extend appellant's involuntary SVP commitment for another two-year term, running from May 2, 2006, until May 2, 2008. On January 9, 2006, after a probable cause hearing and finding of probable cause, the court scheduled a jury trial on the third petition for September 18, 2006.

An amended petition filed on January 27, 2006, corrected the term of recommitment sought by the second recommitment petition. It specified that appellant's "current commitment" "expires on May 2, 2004" and sought an order of recommitment extending appellant's commitment from May 2, 2004, until May 2, 2006.

The People successfully moved to consolidate the 2004–2006 and the 2006–2008 recommitment petitions despite appellant's opposition. On February 21, 2006, the People filed a "consolidated petition" to extend appellant's involuntary commitment as an SVP for two successive two-year periods, from May 2, 2004, to May 2, 2006 and from May 2, 2006, to May 2, 2008.

On February 21, 2006, the court heard the People's motions in limine. The jury selection process began on February 22, 2006. On February 27, 2006, the parties gave their opening statements to the jury. The parties rested on March 7, 2006, and made their closing arguments on March 8, 2006. The jury deadlocked and, on March 10, 2006, the court declared a mistrial.

At a hearing on March 22, 2006, the matter was assigned to Judge Bernal for all purposes.

On April 7, 2006, the court scheduled a hearing on motions in limine for January 4, 2007, and set the trial for January 8, 2007. The court stated on the record that it had examined attorneys' trial calendars and "[t]he first time that both attorneys are available to try this case is January 4[, 2007]." The court commented: "The witnesses are engaged throughout the State of California on these cases as well as other SVPA cases. In order to lock down the witnesses and have date certain the peculiar scheduling of these cases requires that not only this case be taken into consideration but all the other SVPA cases in this county." The court noted that the deputy district attorney

then assigned to the case had to try another SVPA case in April because "if it is delayed for any reason then he is put off as much as a year in trying to get back on the witness calendaring."

Appellant's counsel told the court that she was ready to try the case "right now" and informed the court that her expert witness was available to testify on April 26, 27, and 28. Appellant's counsel told the court: "[Appellant] does not want a delay in this case at all. He is insistent he wants to go forward at the first possible moment and this is the first possible moment, so I am asking that you call for a jury next week." She brought to the superior court's attention there was language in *Litmon v. Superior Court* (2004) 123 Cal.App.4th 1156 [21 Cal.Rptr.3d 21] suggesting that Code of Civil Procedure section 36, subdivision (e), be used as a means of expediting SVP trials.[3] The court responded, "Even a civil case is not something you can always accommodate and there is no prejudice to the defendant in that his recommitment termination is in May 2008." Appellant's counsel reminded the court that two petitions were at stake and one petition expired in 2006. She stated that appellant's position "has always been that he needs to be tried within the time frame of the petition."

The deputy district attorney reiterated the scheduling conflicts and the need for time to update the evaluations. Stating that it was taking "all of that into consideration," the court continued the matter until January 4, 2007.

On August 24, 2006, appellant filed a written motion to dismiss, claiming his rights to due process under the federal and state Constitutions had been violated. In support of his motion, appellant argued that the postponement of the retrial from April 2006 until January 2007 constituted excessive pretrial delay and violated due process because it did not afford him a hearing at a meaningful time. Citing *United States v. $8,850* (1983) 461 U.S. 555 [76 L.Ed.2d 143, 103 S.Ct. 2005] and *Barker v. Wingo* (1972) 407 U.S. 514 [33 L.Ed.2d 101, 92 S.Ct. 2182], appellant claimed a "procedural due process right to a trial within a reasonable time period."

The People filed written opposition. In opposition to the motion, the People argued that there were no speedy trial guarantees under the SVPA and

---

[3] Code of Civil Procedure section 36 states in pertinent part: "(e) Notwithstanding any other provision of law, the court may in its discretion grant a motion for preference served with the memorandum to set or the at-issue memorandum and accompanied by a showing of cause which satisfies the court that the interests of justice will be served by granting this preference. [¶] (f) Upon the granting of such a motion for preference, the clerk shall set the matter for trial not more than 120 days from that date and there shall be no continuance beyond 120 days from the granting of the motion for preference except for physical disability of a party or a party's attorney, or upon a showing of good cause stated in the record. Such a continuance shall be for no more than 15 days and no more than one continuance for physical disability may be granted to any party."

asserted that the trial date was set for the convenience of the parties and mutually agreed upon by them. They quoted from *Litmon v. Superior Court, supra,* 123 Cal.App.4th 1156, which did not involve any procedural due process claim: "Given the absence of statutory time limits, the Courts of Appeal have implied that the only act that could divest the court of subject matter jurisdiction and trigger a dismissal is the People's failure to file a petition for recommitment before the prior commitment expires." (*Id.* at p. 1171.) The People also cited *Orozco v. Superior Court* (2004) 117 Cal.App.4th 170 [11 Cal.Rptr.3d 573]. In *Orozco,* the court determined that the remedy for the pretrial delay in that case, which was attributable to Orozco or his counsel, was "not dismissal but rather, an order directing that the matter proceed to trial forthwith." (*Id.* at p. 179.) The People maintained that the delay in the present case was reasonable, appellant had suffered no resulting prejudice, and the trial should proceed as scheduled.

At the hearing on the motion to dismiss on September 15, 2006, appellant's counsel reminded the court that appellant had adamantly opposed any postponement of trial and the court stated that was also its recollection. Nevertheless, the court refused to dismiss, stating that there was no right to a speedy trial in SVPA cases and "the Court does not have the authority to dismiss the case based upon the premise that you put forth in your motion to dismiss." The court also explained that the attorneys were "involved and engaged in other trials that are SVPA cases and we can only do so many at a time and therefore this is the next available date . . . ."

The Legislature amended the SVPA, effective September 20, 2006, to provide for indeterminate commitment terms for persons determined to be SVP's. (See Stats. 2006, ch. 337, §§ 55, 56, 62.) In the November 2006 general election, voters approved Proposition 83, which also provided for indeterminate terms of commitment for SVP's and went into effect on November 8, 2006. (Prop. 83, §§ 27, 28; see Cal. Const., art. II, § 10, subd. (a).)

On January 2, 2007, the People filed a motion to continue the SVP trial, still set for January 8, 2007, "to a date convenient to all parties and witnesses." The ground for the motion was that three of the four expert witnesses, who had been "issued subpoenas approximately one month prior to the trial date," were unavailable to testify and "due diligence" had been "exercised in an attempt to secure the presence of these experts, by not only contacting them directly, but also the respective counties and prosecutors' offices under which they were currently subpoenaed to see if the schedules of the various witnesses could be adjusted to allow their testimony in the present case."

Deputy District Attorney (D.D.A.) Robert Johnson, the attorney responsible for retrying the matter, stated in his declaration in support of the continuance motion that, after he had issued subpoenas for the four expert witnesses on December 4, 2006, he learned that three out of the four witnesses had already been served with multiple subpoenas, which had higher priority because they had been served earlier, and it did not appear the three experts would be released and available to testify in the trial in this case. He indicated all four witnesses would be available to testify in mid-March.

On January 3, 2007, appellant filed opposition papers to the People's motion for a continuance of the trial. Appellant again moved to dismiss, claiming violation of his rights to due process under the federal and state Constitutions. This motion to dismiss raised essentially the same arguments as the August motion to dismiss.

At the hearing on the motions on January 4, 2007, the court agreed to take judicial notice of the opposition papers filed in response to appellant's previous motion to dismiss. Appellant's counsel argued the People had not acted diligently because the difficulties of securing the appearance of the state evaluators at trial were known at the time of trial setting. D.D.A. Johnson explained that, when he took over the case from Attorney James Cahan, he had been told that "the case was set up and ready to go" and he only belatedly discovered that the subpoenas had not been sent. The court stated that it had met with the parties twice in December and they had "spent considerable time looking at the Court's calendar and the availability of the attorneys and we went over many machinations trying to fit this trial in anywhere this month of January." Appellant's counsel confirmed that the defense experts were unavailable for the entire month of February. The court found there was good cause for a continuance and denied the motion to dismiss. It scheduled motions in limine to begin on March 15, 2007, to be followed by jury selection commencing on March 19, 2007, and trial commencing on about March 21, 2007.

On March 8, 2007, the People moved to retroactively impose an indeterminate term under the new provisions of the SVPA. (See §§ 6604, 6604.1, subd. (a).) Appellant opposed the motion.

After a hearing on March 15, 2007, the court granted the motion. It ordered that appellant's "term of commitment is indeterminate retroactive to his initial order of commitment dated May 2, 2000."

B. *Motions to Dismiss*

Appellant contends that the court violated his right to due process under the Fourteenth Amendment to the United States Constitution by denying his

motions to dismiss the consolidated petitions on the ground of excessive delay in bringing this matter to trial following the declaration of mistrial on March 10, 2006.

### 1. *Principles of Procedural Due Process*

■ "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." (*Wilkinson v. Austin* (2005) 545 U.S. 209, 221 [162 L.Ed.2d 174, 125 S.Ct. 2384]; see U.S. Const., 14th Amend. ["nor shall any State deprive any person of life, liberty, or property, without due process of law"].) The minimum requirements of procedural due process "are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." (*Vitek v. Jones* (1980) 445 U.S. 480, 491 [63 L.Ed.2d 552, 100 S.Ct. 1254].) "The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." (*Cleveland Board of Education v. Loudermill* (1985) 470 U.S. 532, 541 [84 L.Ed.2d 494, 105 S.Ct. 1487].)

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' *Armstrong* v. *Manzo*, 380 U. S. 545, 552 [14 L.Ed.2d 62, 85 S.Ct. 1187, 1191] (1965). See *Grannis* v. *Ordean*, 234 U. S. 385, 394 [58 L.Ed. 1363, 34 S.Ct. 779, 783] (1914)." (*Mathews v. Eldridge* (1976) 424 U.S. 319, 333 [47 L.Ed.2d 18, 96 S.Ct. 893].) "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 313 [94 L.Ed. 865, 70 S.Ct. 652, 656] (1950)." (*Cleveland Board of Education v. Loudermill, supra*, 470 U.S. at p. 542.) "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented." (*Fuentes v. Shevin* (1972) 407 U.S. 67, 81 [32 L.Ed.2d 556, 92 S.Ct. 1983].)

■ "The right to prior notice and a hearing is central to the Constitution's command of due process." (*United States v. James Daniel Good Real Property* (1993) 510 U.S. 43, 53 [126 L.Ed.2d 490, 114 S.Ct. 492].) "We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in ' "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." ' [Citations.]" (*Ibid.*) Thus, "where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause. See, *e.g., United States* v.

*James Daniel Good Real Property*[, *supra,*] 510 U. S. 43, 53 [126 L.Ed.2d 490, 114 S.Ct. 492, 500–501] . . . ; *Zinermon* v. *Burch,* 494 U. S. 113, 128 [108 L.Ed.2d 100, 110 S.Ct. 975, 984–985] (1990) (collecting cases); *Barry* v. *Barchi,* 443 U. S. 55, 64–65 [61 L.Ed.2d 365, 99 S.Ct. 2642, 2649–2650] (1979); *Dixon* v. *Love,* 431 U. S. 105, 115 [52 L.Ed.2d 172, 97 S.Ct. 1723, 1729] (1977); *North American Cold Storage Co.* v. *Chicago,* 211 U. S. 306, 314–320 [53 L.Ed. 195, 29 S.Ct. 101, 103–106] (1908). . . . 'An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.' [*FDIC* v. *Mallen* (1988) 486 U.S. 230,] 240 [100 L.Ed.2d 265, 108 S.Ct. 1780, 1787–1788]." (*Gilbert* v. *Homar* (1997) 520 U.S. 924, 930–931 [138 L.Ed.2d 120, 117 S.Ct. 1807], fn. omitted.) Even in situations justifying postdeprivation hearings, "[a]t some point, a delay in the post-termination hearing would become a constitutional violation. See *Barry* v. *Barchi,* 443 U. S., at 66 [99 S.Ct. at p. 2650]." (*Cleveland Board of Education* v. *Loudermill, supra,* 470 U.S. at p. 547.)

■ In *Mathews* v. *Eldridge, supra,* 424 U.S. 319, a case involving the administrative termination of Social Security disability benefits, the United States Supreme Court articulated a balancing test for resolving what process is constitutionally due. It reiterated: " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' *Morrissey* v. *Brewer,* 408 U. S. 471, 481 [33 L.Ed.2d 484, 92 S.Ct. 2593, 2600] (1972)." (*Id.* at p. 334.) "[T]he Court set forth three factors that normally determine whether an individual has received the 'process' that the Constitution finds 'due': [¶] 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' [¶] By weighing these concerns, courts can determine whether a State has met the 'fundamental requirement of due process'—'the opportunity to be heard "at a meaningful time and in a meaningful manner." ' *Id.,* at 333 [96 S.Ct. 893]." (*Los Angeles* v. *David* (2003) 538 U.S. 715, 716–717 [155 L.Ed.2d 946, 123 S.Ct. 1895].)

The analytical framework set forth in *Mathews* has been applied in many contexts, including in the area of involuntary civil commitment and treatment. (See *Heller* v. *Doe* (1993) 509 U.S. 312, 331 [125 L.Ed.2d 257, 113 S.Ct. 2637] [state's procedures allowing guardians and immediate family members to participate as parties in the involuntary commitment of mentally retarded persons constitutionally permissible]; *Washington* v. *Harper* (1990) 494 U.S. 210, 213, 229 [108 L.Ed.2d 178, 110 S.Ct. 1028] [state prison inmate not entitled to a judicial hearing and prior court authorization before being

forcibly medicated with antipsychotic drugs]; see also *Addington v. Texas* (1979) 441 U.S. 418, 419–420, 425 [60 L.Ed.2d 323, 99 S.Ct. 1804] [extent of the individual's interest in not being involuntarily confined indefinitely and the state's interest in committing the emotionally disturbed must be assessed in determining standard of proof in involuntary civil commitment proceeding].) *Mathews* also has been applied to a claim of unconstitutional postdeprivation delay in an employment situation. (See *FDIC v. Mallen*, *supra*, 486 U.S. at p. 242 [108 S.Ct. 1780] (*Mallen*).)

■ In *Mallen*, *supra*, 486 U.S. 230, the United States Supreme Court considered the constitutionality of a statute that authorized the Federal Deposit Insurance Corporation to suspend an indicted official of a federally insured bank and provided for a postsuspension hearing within 30 days of a written request and for notice of the decision within 60 days of the hearing. (*Id.* at pp. 231–232, 235, 242.) The court stated: "In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken. Cf. *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 434 [71 L.Ed.2d 265, 102 S.Ct. 1148, 1157] (1982); *Mathews* v. *Eldridge*, *supra*, 424 U. S. 319, 334–335 [47 L.Ed.2d 18, 96 S.Ct. 893, 902–903] . . . ." (*Id.* at p. 242.) Thus, in the case of a postdeprivation delay of the right to be heard, the state's reasons for delay and the risk of an erroneous deprivation are added due process considerations.

In *Mallen*, *supra*, 486 U.S. 230, the Supreme Court concluded that "the congressionally recognized interest in maintaining confidence in our banking institutions, coupled with the finding of probable cause that the officer has committed a felony involving dishonesty, is sufficient ground for a regulatory suspension of up to 90 days without the benefit of a post-suspension ruling." (*Id.* at p. 245.) The court distinguished the case from *Barry v. Barchi*, *supra*, 443 U.S. 55 [99 S.Ct. 2642], stating: "In *Barchi*, a horse trainer's license was suspended for 15 days after a horse he trained was discovered to have had drugs in its system during a race. The state regulatory scheme raised a rebuttable presumption that the trainer either administered the drug or was negligent in protecting against such an occurrence. The trainer claimed that he neither administered the drug nor was negligent. In considering the administrative scheme, we first concluded that the State acted within the bounds of due process in suspending the trainer without a pre-suspension hearing. However, we concluded that the scheme violated due process because 'it [was] as likely as not' that the trainer would irretrievably suffer the full penalty before the State would be put to its proof at a post-suspension hearing. *Id.*, at 66 [99 S.Ct. at p. 2650]. In such situations, the State must

assure a prompt post-suspension hearing, 'without appreciable delay.' *Ibid.*" (*Mallen, supra*, 486 U.S. at pp. 246–247.)

The New York statute at issue in *Barchi* did not specify a time limit for holding a postdeprivation hearing. (*Barry v. Barchi, supra*, 443 U.S. at pp. 59–60.) The United States Supreme Court determined that the statute was constitutionally deficient *as applied* because the trainer was not provided with "a prompt postsuspension hearing, one that would proceed and be concluded without appreciable delay." (*Id.* at p. 66.) The court declared: "Once suspension has been imposed, the trainer's interest in a speedy resolution of the controversy becomes paramount . . . . We also discern little or no state interest, and the State has suggested none, in an appreciable delay in going forward with a full hearing. On the contrary, it would seem as much in the State's interest as [trainer's] to have an early and reliable determination with respect to the integrity of those participating in state-supervised horse racing." (*Ibid.*)

The United States Supreme Court has also utilized a different balancing test, one modeled on constitutional speedy trial principles, to address claims of postdeprivation pretrial delay in the context of civil forfeiture proceedings. In *United States v. $8,850, supra*, 461 U.S. 555, the issue was "whether the Government's 18-month delay in filing a civil proceeding for forfeiture of the currency violate[d] the claimant's right to due process of law." (*Id.* at p. 556.) Federal customs officials had "seized $8,850 in currency from the claimant as she passed through customs at Los Angeles International Airport" (*ibid.*) and the claimant argued the delay between the seizure and the initiation of the forfeiture trial violated her due process right to a hearing at a meaningful time (*id.* at p. 562). The court concluded that the claim "mirrors the concern of undue delay encompassed in the right to a speedy trial" and determined the "balancing inquiry" adopted in *Barker v. Wingo, supra*, 407 U.S. 514, to evaluate constitutional speedy trial claims in criminal cases "provides an appropriate framework for determining whether the delay here violated the due process right to be heard at a meaningful time." (*United States v. $8,850*, 461 U.S. at p. 564.) It recognized, however, that "[t]he deprivation in *Barker*—loss of liberty—may well be more grievous than the deprivation of one's use of property at issue" in a civil forfeiture and, consequently, "the balance of the interests, which depends so heavily on the context of the particular situation, may differ . . . ." (*Id.* at p. 565, fn. 14.)

■ "The *Barker* test involves a weighing of four factors: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. [Citation.]" (*United States v. $8,850, supra*, 461 U.S. at p. 564.) The inquiry "necessitates a functional analysis of the right in the particular context of the case" since the right to a speedy trial is relative.

(*Barker v. Wingo, supra,* 407 U.S. at p. 522.) The four factors "are related factors and must be considered together with such other circumstances as may be relevant." (*Id.* at p. 533.) Under a *Barker* analysis, an affirmative showing of particularized trial prejudice is not a prerequisite to proving a constitutional violation or obtaining relief. (*Ibid.*; see *Doggett v. United States* (1992) 505 U.S. 647, 657 [120 L.Ed.2d 520, 112 S.Ct. 2686].) Prejudice is assessed in the light of three interests of defendants, namely preventing oppressive pretrial incarceration, minimizing anxiety and concern of the accused, and limiting the possibility that the defense will be impaired. (*Barker v. Wingo, supra,* 407 U.S. at p. 532.) The responsibility rests upon the courts to "engage in a difficult and sensitive balancing process." (*Id.* at p. 533.)

It is not entirely clear what analytical framework, *Mathews, Barker* or some amalgam, will ultimately be applied by the United States Supreme Court in evaluating a procedural due process claim of excessive pretrial delay in the context of involuntary civil commitments. In the circumstances of postdeprivation delay of the right to be heard, both approaches involve careful balancing of the competing interests and inquiry into the justifications offered by the government for the delay.

2. *Analysis*

In this case, the superior court apparently believed it had no authority to dismiss because appellant was not entitled to a "speedy trial" and failed to recognize that appellant was constitutionally entitled to be heard at a "meaningful time" as a matter of due process. The court below failed to engage in a nuanced balancing process necessary to resolve appellant's procedural due process claim.

 We begin by applying the *Mathews* balancing test. Here, the significance of "the private interest . . . affected by the official action" (*Mathews v. Eldridge, supra,* 424 U.S. at p. 335) cannot be understated since it is "the most elemental of liberty interests" (*Hamdi v. Rumsfeld* (2004) 542 U.S. 507, 529 [159 L.Ed.2d 578, 124 S.Ct. 2633]), the fundamental right of a citizen "to be free from involuntary confinement by his own government without due process of law." (*Id.* at p. 531.) "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action. *Youngberg* v. *Romeo,* 457 U. S. 307, 316 [73 L.Ed.2d 28, 102 S.Ct. 2452, 2458] (1982)." (*Foucha v. Louisiana* (1992) 504 U.S. 71, 80 [118 L.Ed.2d 437, 112 S.Ct. 1780]; see *id.* at p. 90 (dis. opn. of Kennedy, J.) ["As incarceration of persons is the most common and one of the most feared instruments of state oppression and state indifference, we ought to acknowledge at the outset that

freedom from this restraint is essential to the basic definition of liberty in the Fifth and Fourteenth Amendments of the Constitution."].) "It is clear that 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.' *Addington* v. *Texas*, [*supra*], 441 U. S. 418, 425 [60 L.Ed.2d 323, 99 S.Ct. 1804, 1809] . . . ." (*Jones v. United States* (1983) 463 U.S. 354, 361 [77 L.Ed.2d 694, 103 S.Ct. 3043].)

"[F]or the ordinary citizen, commitment to a mental hospital produces 'a massive curtailment of liberty,' *Humphrey* v. *Cady*, 405 U. S. 504, 509 [31 L.Ed.2d 394, 92 S.Ct. 1048, 1052] (1972), and in consequence 'requires due process protection.' *Addington* v. *Texas*, [*supra*], 441 U. S. 418, 425 [60 L.Ed.2d 323, 99 S.Ct. 1804, 1809] . . . ; *O'Connor* v. *Donaldson*, 422 U. S. 563, 580 [45 L.Ed.2d 396, 95 S.Ct. 2486, 2496] (1975) (Burger, C. J., concurring)." (*Vitek v. Jones*, *supra*, 445 U.S. at pp. 491–492 [100 S.Ct. 1254].) "The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital 'can engender adverse social consequences to the individual' and that '[w]hether we label this phenomena "stigma" or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual.' *Addington* v. *Texas*, *supra*, at 425–426 [99 S.Ct. at p. 1809]. See also *Parham* v. *J. R.*, 442 U. S. 584, 600 [61 L.Ed.2d 101, 99 S.Ct. 2493, 2503] (1979)." (*Id.* at p. 492; see *Zinermon v. Burch*, *supra*, 494 U.S. at p. 131 [110 S.Ct. 975] [confinement at state hospital for five months without a hearing or any other procedure to determine either that the individual had validly consented to voluntary admission or met the statutory standard for involuntary placement, infringed on liberty interest].) The loss of personal freedom, which is the heart of the liberty protected by due process (see *Zadvydas v. Davis* (2001) 533 U.S. 678, 690 [150 L.Ed.2d 653, 121 S.Ct. 2491]), by forced confinement in a mental institution is many orders of magnitude greater than the suspension of a license or termination of employment.

The second *Mathews* factor, "the risk of an erroneous deprivation of such interest through the procedures used" (*Mathews v. Eldridge*, *supra*, 424 U.S. at p. 335), is considerable. Appellant has already experienced an extended confinement without any determination that he was an SVP under the second and third recommitment petitions. The loss of liberty following May 2, 2004, the date his last order of commitment expired, is irretrievable regardless of the outcome of trial. The risk of error is highlighted here by the mistrial declared more than two years ago, in March 2006, after jurors could not reach a decision.

■ As to the third *Mathews* factor, appellant's private interest is opposed by the state's "compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and

who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes [citations] . . . . [Citation.]" (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 924 [119 Cal.Rptr.2d 1, 44 P.3d 949]; see *Seling v. Young* (2001) 531 U.S. 250, 262 [148 L.Ed.2d 734, 121 S.Ct. 727] [*Kansas v. Hendricks* recognized that state has "an interest in protecting the public from dangerous individuals with treatable as well as untreatable [mental] conditions"]; *Addington v. Texas, supra,* 441 U.S. at p. 426 [99 S.Ct. 1804] [state has an interest in protecting "the community from the dangerous tendencies of some who are mentally ill"].) But the state has no interest in the involuntary civil confinement of persons who have no mental disorder or who are not dangerous to themselves or others. (*Addington v. Texas, supra,* 441 U.S. at p. 426; cf. *Foucha v. Louisiana, supra,* 504 U.S. at pp. 80–82 [state had no legitimate interest in continued detention of "insanity acquittee" who was no longer mentally ill]; *O'Connor v. Donaldson, supra,* 422 U.S. at p. 576 [95 S.Ct. 2486] ["State cannot constitutionally confine without more a nondangerous [mentally ill] individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends."].)

We speculate that the government may have an additional interest in conserving limited resources, which constrain its ability to provide expeditious SVP proceedings. (Cf. *Mathews v. Eldridge, supra,* 424 U.S. at p. 348 ["Government's interest . . . in conserving scarce fiscal and administrative resources is a factor that must be weighed."]; cf. also *Wilkinson v. Austin, supra,* 545 U.S. at p. 228 [125 S.Ct. 2384] [problem of scarce resources was a component of state's interest to be considered by court applying *Mathews* analysis to determine process due to inmates before assigning them to state's highest security prison].) But this pecuniary interest runs counter to the interest of the state in avoiding unjustified confinement of individuals not qualifying as SVP's and any potential liability (see *Zinermon v. Burch, supra,* 494 U.S. at p. 134, fn. 19). In any case, such pecuniary interest must be accorded a much lesser weight than the quintessential liberty interest at stake here.

■ Given these competing factors, we firmly believe that the norm to comport with the demands of procedural due process in the context of involuntary SVP commitments must be a trial in advance of the potential commitment term since, under California law, the individual alleged to be an SVP is confined pending final determination of an SVP petition.[4] When an SVP trial does not take place until after or into the term of commitment at

---

[4] If a judge, after a hearing pursuant to section 6602, determines that there is probable cause, the judge must "order that the person remain in custody in a secure facility until a trial is completed and shall order that a trial be conducted to determine whether the person is, by reason of a diagnosed mental disorder, a danger to the health and safety of others in that the

issue, the trier of fact never actually determines whether the person *was* an SVP while confined pending trial following expiration of the last-ordered commitment. (§ 6604 ["The court or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator."]; see § 6600, subd. (a)(3) ["Jurors shall be admonished that they may not find a person a sexually violent predator based on prior offenses absent relevant evidence of a currently diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."]; Judicial Council of Cal. Crim. Jury Instns. (2007) CALCRIM No. 3454, pp. 1085–1087.) "The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' [Citation.]" (*Mathews v. Eldridge, supra,* 424 U.S. at p. 333.)

A predeprivation trial is certainly feasible since persons potentially subject to commitment as an SVP are identified while incarcerated in prison or confined under a prior SVP commitment. Thus, SVP proceedings are distinguishable from situations where a temporary, short-term confinement may be justified by exigent circumstances.[5] Predeprivation trials safeguard against unconstitutional deprivations of personal liberty and, at the same time, accomplish the state's primary objective.

We realize that, in this case, appellant is not claiming that he was constitutionally entitled to a trial prior to expiration of his last ordered term of commitment on May 2, 2004, and he is not complaining about the delay prior to the trial-setting hearing in April 2006. While we focus on the months of delay following that hearing, it is significant that at the time of that hearing appellant's last order of recommitment had expired almost two years earlier and the first of the two recommitment terms at issue was about to expire on May 2, 2006. Further, the March 2006 mistrial as the result of a hung jury emphasized the possibility that appellant might not be determined to be an SVP at trial. In considering the constitutionality of the challenged delay, the

person is likely to engage in acts of sexual violence upon his or her release from the jurisdiction of the Department of Corrections or other secure facility." (§ 6602, subd. (a).)

[5] Under the Lanterman-Petris-Short (LPS) Act (§ 5000 et seq.), a person may be detained for 72 hours for evaluation and treatment (§ 5150) and the detention may be extended by certification for 14 days of intensive treatment (§ 5250). After that, an imminently dangerous person may be confined for an additional period of not more than 180 days for further treatment under a petition for postcertification treatment. (§§ 5300, 5301.) But a person subjected to such petition is entitled to a jury trial that commences within 10 judicial days of the filing of the petition. (§ 5303.) "If no decision has been made within 30 days after the filing of the petition [for postcertification treatment], not including extensions of time requested by the person's attorney, the person shall be released." (*Ibid.*)

fact appellant continued in confinement pending trial under the consolidated second and third petitions is highly relevant and necessarily informs our due process analysis.

As to the reasons for delaying retrial until January 8, 2007, and then for granting a continuance of trial until March 19, 2007, appellant now argues that delays were "essentially the fault of the state" since that is "the first time the prosecutor, appellant's trial counsel and the prosecution witnesses would be available." He asserts that, "[a]lthough[] it is not clear to what, if any, extent overall trial court congestion was a factor in appellant's case, the delay must also be considered in the context of the continuing problem of delays in trying SVP cases." The People argue that "eleven months is not an undue amount of time" "[g]iven the need for updated evaluations to ascertain appellant's current mental condition, the complexity involved in incorporating past testimony into legal strategy and the time it takes to ensure the presence for trial of both state evaluators and defense experts at trial . . . ." This proffered justification reflects a "business as usual" approach to trial scheduling despite the ongoing deprivation of personal liberty that was occurring.

■ In our view, any chronic, systematic postdeprivation delays in SVP cases that only the government can rectify must be factored against the People. While delays based upon the uncontrollable unavailability of a critical witness may be justifiable (cf. *Barker v. Wingo*, *supra*, 407 U.S. at pp. 531, 533–534 [illness of the ex-sheriff in charge of investigation constituted "strong excuse" but excused only seven months of a five-year delay]), postdeprivation delays due to the unwillingness or inability of the government to dedicate the resources necessary to ensure a prompt SVPA trial may be unjustifiable. Just as "unreasonable delay in run-of-the-mill criminal cases cannot be justified by simply asserting that the public resources provided by the State's criminal-justice system are limited and that each case must await its turn" (*Barker v. Wingo*, *supra*, 407 U.S. at p. 538 (conc. opn. of White, J.)), postdeprivation pretrial delays in SVPA proceedings cannot be routinely excused by systemic problems, such as understaffed public prosecutor or public defender offices facing heavy caseloads, underdeveloped expert witness pools, or insufficient judges or facilities to handle overcrowded trial dockets.[6]

---

[6] Justice White stated in his concurring opinion in *Barker*: "[I]t is appropriate to emphasize that one of the major purposes of the [speedy trial] provision is to guard against inordinate delay between public charge and trial, which, wholly aside from possible prejudice to a defense on the merits, may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' *United States* v. *Marion*, 404 U. S. 307, 320 [30 L.Ed.2d 468, 92 S.Ct. 455, 463]

In this particular case, however, there was no showing below that the initial delay in setting retrial was mainly attributable to systemic problems for which the government was responsible rather than to the commonplace challenges of trial scheduling. It is not entirely clear from the record to what extent the initial delay in setting the matter for retrial was caused by appellant's counsel. She did state at the trial setting hearing that she was ready to retry the case "right now" but apparently the D.D.A. then assigned to appellant's case was going to trial on another SVPA case that month. The D.D.A. indicated at the trial setting hearing, without any correction by appellant's counsel, that the People's experts were available in three months but "the trial schedule of defense interferes to try it after that."

Even if the initial delay in setting trial for January 2007 comported with principles of procedural due process, the postponement of the trial until mid-March 2007 cannot be reconciled with those principles given appellant's complete loss of liberty awaiting trial. By January 2007, appellant had already been confined throughout the entire first "potential" two-year term and well into the second "potential" two-year term sought by the consolidated recommitment petitions. D.D.A. Johnson's explanation for not subpoenaing the government's experts until December 2006 for the January 2007 trial was that he thought they had already been subpoenaed by a predecessor, not that he was unaware of the high demand for the experts at trials statewide. Even if his personal belief that subpoenas had been already sent was reasonable and he acted diligently in attempting to rectify the problem after discovering the oversight, the People knew the difficulties of scheduling the state's experts at least since the April 2006 trial-setting hearing and had had nine months to secure their attendance. Putting off trial for another two months would mean a continued loss of liberty without any determination that appellant was in fact

(1971). . . . [F]or those who desire an early trial, these personal factors should prevail if the only countervailing considerations offered by the State are those connected with crowded dockets and prosecutorial case loads." (*Barker v. Wingo, supra,* 407 U.S. at p. 537 (conc. opn. of White, J.).) We also observe that the American Bar Association's (ABA) Standards for Criminal Justice regarding speedy trial no longer excuse delay resulting from the "congestion of the trial docket" due to "exceptional circumstances." (ABA Stds. for Crim. Justice (3d ed. 2007) Speedy Trial and Timely Resolution of Criminal Cases, std. 12-2.3 and Com., pp. 48–50; see former std. 12-2.3(b).) The commentary to the revised standards states: "Delay resulting from chronic congestion of the docket or from failure of the prosecutor to be prepared to go to trial within the allowable period should not be excused. In cases where truly exceptional circumstances overtax court or prosecutorial resources (e.g., a sudden influx of a large volume of cases resulting from a large-scale civil disorder), the provision in new standard 12-2.3(a)(vi) allowing for exclusion of time in unusual circumstances should provide sufficient flexibility." (ABA Stds. for Crim. Justice, *supra,* Speedy Trial and Timely Resolution of Criminal Cases, Com. to std. 12-2.3, p. 50, fn. omitted.) These ABA standards "approach the issues of speedy trial and timely case resolution from a systemic perspective" and require jurisdictions to "provide adequate resources to the institutions and agencies involved in criminal justice processes, in order to enable the purposes of these standards to be achieved." (*Id.,* std. 12-1.4.)

an SVP. Consequently, the proffered justification is inadequate to excuse a further delay of retrial given the magnitude of the liberty interest at stake, the serious harm to this interest already occasioned by the protracted delay, and the possibility that the interim decisions (the probable cause hearings on the second and third recommitment petitions) may have been mistaken.

We arrive at the same due process conclusion under a *Barker*-type analysis. The extensive pretrial delay following the filing of the petitions certainly creates a presumption of prejudice that triggers a *Barker* type of balancing test. (See *Doggett v. United States, supra*, 505 U.S. at p. 652, fn. 1 ["lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year"].) The second recommitment petition was filed February 23, 2004, and the third recommitment petition was filed September 29, 2005. For all the reasons stated above, the government's proffered justification for continuance of the January trial date must be weighed against it.

As to appellant's assertion of his right to due process, he strongly opposed postponement of retrial to January 2007. Appellant filed a motion to dismiss about four and a half months after the April 2006 trial setting. The record does not explain the time lag but the record does not establish that it resulted from the public defender's office being overburdened. In a *Barker*-type due process analysis, the weight ascribed to complaints of pretrial delay ordinarily depends upon their frequency and force. (Cf. *Barker v. Wingo, supra*, 407 U.S. at pp. 528–529.) Consequently, a belated assertion of a procedural due process right to a speedy SVP trial is entitled to less weight than a prompt assertion of such right. Of course, appellant immediately reasserted his procedural due process rights in his January 2007 motion to dismiss in response to the People's motion for a continuance of the trial. This latter assertion deserves serious weight.

Appellant claims the "primary prejudice" resulting from the postmistrial delay is that he became subject to the new law changing the commitment of an SVP from successive two-year terms to an indeterminate term. Absent any showing of bad intent on the part of the government, this consequence is simply not the type of fundamental unfairness that procedural due process is aimed at preventing. *Barker* recognizes several kinds of harm that may result from pretrial delay, "including 'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence. *Barker*, 407 U. S., at 532 [92 S.Ct. at p. 2193]; see also *Smith* v. *Hooey*, 393 U. S. 374, 377–379 [21 L.Ed.2d 607, 89 S.Ct. 575, 576–578] (1969); *United States* v. *Ewell*, 383 U. S. 116, 120 [15 L.Ed.2d 627, 86 S.Ct. 773, 776] (1966)." (*Doggett v. United States, supra*, 505 U.S. at p. 654.) In our view,

lengthy postdeprivation pretrial delay in an SVP proceeding is oppressive. In this case, we cannot turn a blind eye to the years of pretrial confinement that have elapsed following expiration of the last ordered term of commitment.

As the United States Supreme Court has recognized in the context of the constitutional right to speedy trial, "the primary burden [is] on the courts and the prosecutors to assure that cases are brought to trial." (*Barker v. Wingo, supra*, 407 U.S. at p. 529.) "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." (*Id.* at p. 531.) "Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. . . . Condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority. The Government, indeed, can hardly complain too loudly, for persistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice; the more weight the Government attaches to securing a conviction, the harder it will try to get it." (*Doggett v. United States, supra*, 505 U.S. at p. 657.)

The ultimate responsibility for bringing a person to trial on an SVP petition at a "meaningful time" rests with the government. Appellant's fundamental liberty interest outweighed the state's countervailing interests in postponement of the trial set for January 2007. The approximate two-month delay of retrial until March 2007, although only incremental, meant the cumulative loss of a whole year in custody after mistrial. "Time is an irretrievable commodity. . . . [T]ime once past can never be recovered." (*People v. Simpson* (1973) 30 Cal.App.3d 177, 183 [106 Cal.Rptr. 254].) Under our country's long-standing jurisprudence, a person has a right to liberty that a government may not abridge without due process. If the constitutional right to procedural due process is not to be an empty concept in the context of involuntary SVP commitment proceedings, it cannot be dispensed with so easily. The court should have granted appellant's January 2007 motion to dismiss the consolidated petitions.

Our conclusion, of course, does not preclude other civil commitment proceedings against appellant if appropriate. Appellant might still be involuntarily committed and treated under the LPS Act. (§ 5000 et seq.) Further, our conclusion is not mooted by the trial court's retroactive order of indeterminate commitment, which we find to be improper.

## C. *Retroactivity*

The court's March 15, 2007 order committing appellant to an indeterminate term as an SVP "retroactive to his initial order of commitment dated May 2, 2000" occurred after the passage of Proposition 83. As approved by the voters in November 2006, section 6604 provides in pertinent part: "If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an indeterminate term . . . ." Section 6604.1, subdivision (a), presently provides: "The indeterminate term of commitment provided for in Section 6604 shall commence on the date upon which the court issues the initial order of commitment pursuant to that section."

The People maintain that these provisions support the superior court's order. They contend that the use of the term "initial" in section 6604.1 discloses an intent to make, and "by definition" makes, the indeterminate term retroactive. They also assert that "by erasing all references to subsequent extended commitments, the Legislature and the electorate demonstrated their intent to have the indeterminate term apply retroactively to the SVP's initial commitment date, regardless of when the person was committed." We find the People's contentions unpersuasive.

 "It is the general rule that a statute is not retroactive in operation unless the legislative intent to the contrary is clear. [Citation.]" (*Estate of Childs* (1941) 18 Cal.2d 237, 246 [115 P.2d 432].) "California continues to adhere to the time-honored principle, codified by the Legislature in Civil Code section 3 and similar provisions, that in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature or the voters must have intended a retroactive application." (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1208–1209 [246 Cal.Rptr. 629, 753 P.2d 585]; see Pen. Code, § 3; Code Civ. Proc., § 3.) "Even without an express declaration, a statute may apply retroactively if there is ' "a clear and compelling implication" ' that the Legislature intended such a result. (*People v. Grant* (1999) 20 Cal.4th 150, 157 [83 Cal.Rptr.2d 295, 973 P.2d 72] . . . .)" (*People v. Alford* (2007) 42 Cal.4th 749, 754 [68 Cal.Rptr.3d 310, 171 P.3d 32].) The legislative history or the context of the enactment may provide a sufficiently clear indication of intent to make a statute operate retrospectively. (*Evangelatos v. Superior Court, supra*, 44 Cal.3d at p. 1210.)

 "In interpreting a voter initiative, we apply the same principles that govern our construction of a statute. (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900 [135 Cal.Rptr.2d 30, 69 P.3d 951] . . . .)" (*People v. Lopez* (2005) 34 Cal.4th 1002, 1006 [22 Cal.Rptr.3d 869, 103 P.3d 270].) If statutory language is ambiguous, courts refer to indicia of the voters' intent,

such as the analyses and arguments contained in the official ballot pamphlet. (*Robert L. v. Superior Court, supra*, 30 Cal.4th at p. 901.) The court's task is to effectuate the electorate's intent. (*Ibid.*)

To answer the pivotal question of intent, we look first at the legislative history of sections 6604 and 6604.1. Section 6604, which was part of the original SVPA enacted in 1995, provided for a two-year commitment. (Stats. 1995, ch. 763, § 3, pp. 5925–5926.) Section 6604.1 was added to the SVPA in 1998. (Stats. 1998, ch. 19, § 5, eff. Apr. 14, 1998.) Its enactment put to rest the issue whether a person committed as an SVP was entitled to credit for confinement prior to the initial order of commitment.

As enacted in 1998, section 6604.1 read: "(a) The two-year term of commitment provided for in Section 6604 shall commence on the date upon which the court issues the initial order of commitment pursuant to that section. The two-year term shall not be reduced by any time spent in a secure facility prior to the order of commitment. For subsequent extended commitments, the term of commitment shall be from the date of the termination of the previous commitment. [¶] (b) This section shall remain in effect only until January 1, 1999, and as of that date is repealed, unless a later enacted statute, that is enacted before January 1, 1999, deletes or extends that date." In regard to section 6604.1, the Legislature declared: "[T]he provisions of Article 4 (commencing with Section 6600) of Chapter 2 of Part 2 of Division 6 of the Welfare and Institutions Code establish a civil mental health commitment for a period of two years for persons found to be sexually violent predators and that, consistent with a civil mental health commitment, credits that may reduce a term of imprisonment are not applicable. Accordingly, . . . Section 5 of this act, which adds Section 6604.1 to the Welfare and Institutions Code, does not constitute a change in, but is declaratory of, existing law." (Stats. 1998, ch. 19, § 10.) Subsequent legislation enacted that same year extended the operation of section 6604.1 and provided a later sunset date. (Stats. 1998, ch. 961, § 7, eff. Sept. 29, 1998.)

In 2000, the Legislature amended section 6604.1 to eliminate any sunset provision. (Stats. 2000, ch. 420, § 4, eff. Sept. 13, 2000.) The amendment also made nonsubstantive changes in subdivision (a) of section 6604.1 and added a new subdivision (b) making specified provisions relating to evaluations in section 6601 and "[t]he rights, requirements, and procedures set forth in Section 6603" applicable to extended commitment proceedings. (*Ibid.*) The 2000 legislation also made nonsubstantive changes in section 6604, merely substituting "petition for extended commitment" for "new petition for commitment." (Stats. 2000, ch. 420, § 3, eff. Sept. 13, 2000.)

In 2006, the Legislature amended sections 6604 and 6604.1 to provide for an indeterminate term instead of a two-year term of commitment, effective

September 20, 2006. (Stats. 2006, ch. 337, §§ 55, 56, 62.) The legislation did not contain any provision expressly stating that section 6604 or 6604.1, as amended, operated retroactively. In section 6604.1, the Legislature simply substituted "indeterminate" for "two-year" in the first sentence of former subdivision (a) and deleted the remainder of that subdivision so that subdivision (a) read: "The indeterminate term of commitment provided for in Section 6604 shall commence on the date upon which the court issues the initial order of commitment pursuant to that section." (Stats. 2006, ch. 337, §§ 56, 62, eff. Sept. 20, 2006.) The Legislature changed the language in subdivision (b) of section 6604.1 to omit references to extended commitments and instead referred to "all commitment proceedings."[7] (Stats. 2006, ch. 337, § 56.)

In November 2006, the voters approved Proposition 83, a wide-ranging initiative measure covering sex offenses, registered sex offenders, and SVP law. This initiative measure, like the legislation that became effective in September 2006, amended 6604 and 6604.1 to provide for an indeterminate term of commitment instead of a two-year term. (Prop. 83, §§ 27, 28, approved Nov. 7, 2006, eff. Nov. 8, 2006.) Section 6604.1, subdivision (a), as approved by the voters, reads identically to the Legislature's 2006 version: "The indeterminate term of commitment provided for in Section 6604 shall commence on the date upon which the court issues the initial order of commitment pursuant to that section." (Prop. 83, § 28, approved Nov. 7, 2006.) Contrary to the People's claim, section 6604.1, subdivision (b), still refers to extended commitments: "The provisions of subdivisions (c) to (i), inclusive, of Section 6601 shall apply to evaluations performed for purposes of *extended commitments*."[8] (Italics added.)

We put no stock in the People's argument that section 6604.1's require- ment that the indeterminate term of commitment commence on the date of the "initial order of commitment" demonstrates an intent to make the indeterminate term retroactive. The 2006 amendments merely changed the length of commitment and left intact the preexisting language in the first

---

[7] As rewritten by the Legislature, section 6604.1, subdivision (b), provided: "The person shall be evaluated by two practicing psychologists or psychiatrists, or by one practicing psychologist and one practicing psychiatrist, designated by the State Department of Mental Health. The provisions of subdivisions (c) to (i), inclusive, of Section 6601 shall apply to evaluations performed pursuant to a trial conducted pursuant to subdivision (f) of Section 6605. The rights, requirements, and procedures set forth in Section 6603 shall apply to all commitment proceedings." (Stats. 2006, ch. 337, § 56.)

[8] As approved by the voters in 2006, section 6604.1, subdivision (b), currently provides in full: "The person shall be evaluated by two practicing psychologists or psychiatrists, or by one practicing psychologist and one practicing psychiatrist, designated by the State Department of Mental Health. The provisions of subdivisions (c) to (i), inclusive, of Section 6601 shall apply to evaluations performed for purposes of extended commitments. The rights, requirements, and procedures set forth in Section 6603 shall apply to all commitment proceedings."

sentence of former section 6604.1, subdivision (a). Under these circumstances, we cannot say that the retention of the phrase "initial order," which was part of language added in 1998 to clarify the unavailability of credit to reduce the term of commitment, reflects any particular intent in 2006 to make an indeterminate term retroactive to the very first date of commitment as an SVP.

The People suggest that the declaration of intent in Proposition 83 indicates the measure "would do away with all SVP recommitment trials," which means "the indeterminate term is retroactive to appellant's initial commitment date." They point to the following statement of intent: "The People find and declare each of the following: [¶] . . . [¶] (k) California is the only state, of the number of states that have enacted laws allowing involuntary civil commitments for persons identified as sexually violent predators, which does not provide for indeterminate commitments. California automatically allows for a jury trial every two years irrespective of whether there is any evidence to suggest or prove that the committed person is no longer a sexually violent predator. As such, this act allows California to protect the civil rights of those persons committed as a sexually violent predator while at the same time protect society and the system from unnecessary or frivolous jury trial actions where there is no competent evidence to suggest a change in the committed person." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) Prop. 83, § 2, p. 127.)

Proposition 83's declaration of intent does not explicitly make indeterminate terms retroactive and is equally consistent with the intent to impose indeterminate terms of commitment in future commitment proceedings. "[A] remedial purpose does not necessarily indicate an intent to apply the statute retroactively. Most statutory changes are, of course, intended to improve a preexisting situation and to bring about a fairer state of affairs, and if such an objective were itself sufficient to demonstrate a clear legislative intent to apply a statute retroactively, almost all statutory provisions and initiative measures would apply retroactively rather than prospectively." (*Evangelatos v. Superior Court, supra*, 44 Cal.3d at p. 1213.)

The People do not direct us to anything else in the election materials indicating that the drafters or proponents of the proposition or the voters intended to have courts impose, without trial, indeterminate terms retroactive to original commitment dates. The analysis by the Legislative Analyst, which was provided to voters in the Official Voter Information Guide, described the commitment term of SVP's: "Offenders designated as SVPs by the courts are committed to a state mental hospital for up to two years. An offender can be recommitted by the courts in subsequent court proceedings." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) analysis of Prop. 83 by Legis. Analyst,

p. 43.) The analysis stated that the change to the SVP law would require that "SVPs be committed by the court to a state mental hospital for an undetermined period of time rather than the renewable two-year commitment provided for under existing law." (*Id.* at p. 44.)

Under these circumstances, "there is no reason to believe that the electorate harbored any specific thoughts or intent with respect to the retroactivity issue at all." (*Evangelatos v. Superior Court, supra,* 44 Cal.3d at p. 1212.) "Because past cases have long made it clear that initiative measures are subject to the ordinary rules and canons of statutory construction [citations], informed members of the electorate who happened to consider the retroactivity issue would presumably have concluded that the measure—like other statutes—would be applied prospectively because no express provision for retroactive application was included in the proposition." (*Id.* at pp. 1212–1213.)

The People insist that case law supports their retroactivity argument. We find none of the cases cited to be on point. In *People v. Buttes* (1982) 134 Cal.App.3d 116, 128–129 [184 Cal.Rptr. 497], an appellate court rejected an argument that an order of commitment for an additional two-year extended term under Penal Code section 1026.5 violated the constitutional prohibition against ex post facto laws. In *People v. Superior Court (Woods)* (1990) 219 Cal.App.3d 614 [268 Cal.Rptr. 379], an appellate court rejected another ex post facto argument that Penal Code section 1026.2, subdivision (e), did not apply because the provision "was not part of the law in effect at the time he entered his NGI plea." (*People v. Superior Court (Woods)*, at p. 617.) In each case, the ex post facto challenge was rejected because the laws were not penal and did not increase criminal punishment. (See *People v. Buttes, supra,* 134 Cal.App.3d at p. 128; *People v. Superior Court (Woods), supra,* 219 Cal.App.3d at p. 617; see also *Kansas v. Hendricks* (1997) 521 U.S. 346, 370 [138 L.Ed.2d 501, 117 S.Ct. 2072] [ex post facto clause pertains exclusively to penal laws].) Neither case involved the statutory interpretation question whether a law was intended to operate retroactively.

In *Rio Linda Union School Dist. v. Workers' Comp. Appeals Bd.* (2005) 131 Cal.App.4th 517 [31 Cal.Rptr.3d 789], a third case cited by the People, the appellate court reviewed a decision of the Workers' Compensation Appeals Board (WCAB). The court held that the WCAB had incorrectly concluded that a new workers' compensation statute, which repealed a purely statutory workers' compensation right, did not apply to a workers' compensation case submitted to a workers' compensation judge for decision prior to the new law's effective date but actually decided four days after the effective date. (*Id.* at pp. 521, 532.) The court explained that "the repeal of a statutory right or remedy triggers the application of rules distinct from the traditional law

regarding the prospective or retroactive application of a statute" and "[t]he repeal of such statutory right applies to *all* pending cases, at whatever stage the repeal finds them, unless the Legislature has expressed a contrary intent by an express saving clause or by implication from contemporaneous legislation. (*Younger v. Superior Court* [1978] 21 Cal.3d [102] at p. 110 [145 Cal.Rptr. 674, 577 P.2d 1014] . . . .)" (*Id.* at p. 528.) The "well settled rule that an action wholly dependent on statute abates if the statute is repealed without a saving clause before the judgment is final" (*Younger v. Superior Court, supra,* 21 Cal.3d at p. 109) has no application here.

■ We are left with the presumption that new law operates prospectively absent a clear expression of contrary intent. "Moreover, 'the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' (*People v. Black* [(1982) 32 Cal.3d 1,] 5 [184 Cal.Rptr. 454, 648 P.2d 104].) Similarly, a statute should not be given a construction that results in rendering one of its provisions nugatory. (See *Select Base Materials v. Board of Equal.* [(1959) 51 Cal.2d 640,] 647 [335 P.2d 672]; *People v. Hawes* (1982) 129 Cal.App.3d 930, 939 [181 Cal.Rptr. 456] . . . .)" (*People v. Craft* (1986) 41 Cal.3d 554, 560 [224 Cal.Rptr. 626, 715 P.2d 585].)

■ Thus, subdivision (a) of section 6604.1 must be construed in conjunction with subdivision (b) of section 6604.1, which requires section 6601, subdivisions (c) to (i), to be applied to "evaluations performed for purposes of extended commitments" and requires the "rights, requirements, and procedures set forth in Section 6603," including the right to jury trial (§ 6603), to be applied to "all commitment proceedings." ■ Section 6604 expressly conditions the imposition of an indeterminate term upon a "court or jury determin[ing] that the person is a sexually violent predator . . . ." In this larger context, the most reasonable interpretation of sections 6604 and 6604.1 is that an indeterminate term of commitment may be ordered only following a trial in which a person is determined to be an SVP and that term commences on the date upon which the court issues its order pursuant to this current version of section 6604.

Sections 6604 and 6604.1 in effect in March 2007 did not authorize an order imposing an indeterminate term of commitment retroactive to the date upon which appellant was first committed as an SVP under predecessor law. Our conclusion alleviates the need to reach the host of constitutional and jurisdictional claims raised by appellant against the court's retroactive order of commitment.

The March 15, 2007 order imposing an indeterminate term of commitment as an SVP is reversed. Upon remand, the court is directed to dismiss the

consolidated recommitment petitions that sought to extend appellant's commitment as an SVP until May 2, 2008.

Rushing, P. J., and Premo, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 13, 2008, S163875.